**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JOHN E. HARRISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-473-CJB |
| | ) | |
| SOROOF INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

Peter B. Ladig, BAYARD, P.A., Wilmington, Delaware; Meghan A. Adams, MORRIS JAMES LLP, Wilmington, Delaware, Attorneys for Plaintiff.

Ryan W. Browning, MANNING GROSS + MASSENBURG, Wilmington, Delaware; Haig V. Kalbian, D. Michelle Douglas, William P. McGrath, Jr., KALBIAN HAGERTY LLP, Washington, District of Columbia, Attorneys for Defendant.

---

## MEMORANDUM OPINION

July 27, 2018
Wilmington, Delaware

Presently pending before the Court is a motion to dismiss filed by Defendant Soroof International, Inc. ("Defendant" or "Soroof") pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion"). (D.I. 6) Specifically, Soroof argues that this action should be dismissed because: (1) Plaintiff John E. Harrison ("Plaintiff" or "Harrison") lacks standing to assert an alter ego/veil piercing claim (the "alter ego claim"); (2) this Court lacks personal jurisdiction over Soroof; and (3) Harrison has failed to allege a plausible alter ego claim. For the reasons that follow, the Court GRANTS-IN-PART Soroof's Motion and DENIES-IN-PART the remainder of the Motion as moot.

## I.    BACKGROUND

### A.    Factual Background

In August 2007, Soroof and Quivus Holdings, LLC (an entity wholly owned by Harrison) formed Quivus Systems, LLC ("Quivus"), a Delaware limited liability company. (D.I. 1, ex. A ("Complaint") at ¶ 1; D.I. 6, ex. A at 1) Soroof and Quivus Holdings, LLC were the sole members of Quivus. (Complaint at ¶ 1) Under the terms of Quivus' operating agreement (the "operating agreement"),[1] Harrison was to serve as Chief Executive Officer ("CEO") of Quivus. (*Id.* at ¶ 12)

During the negotiations over the operating agreement, Harrison wanted equal representation on Quivus' board of directors (the "board"), while Soroof wanted to control the board. (*Id.*) The parties compromised in the end. (*Id.*) The operating agreement ultimately gave Soroof control of the board—it permitted Soroof to appoint three board members, while Harrison

---

[1]    The operating agreement, which Defendant attached as an exhibit to its opening brief, is cited herein, as it is integral to Harrison's Complaint and referenced therein. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993).

2

(via Quivus Holdings, LLC) was permitted to appoint two members. (*Id.*; D.I. 6, ex. A at §

10.1(a)) In return, Harrison negotiated a provision of the operating agreement that stated that

Harrison could only be removed as CEO if one of Harrison's own board nominees agreed to his

removal. (Complaint at ¶ 12; D.I. 6, ex. A at § 10.1(d)(2))

On July 1, 2014, Soroof removed Harrison as CEO of Quivus without an approving vote

of at least one of Harrison's board nominees, in violation of the terms of the operating

agreement. (Complaint at ¶¶ 11-12; *see also id.* at ¶ 1) From that date forward, Quivus'

operation and management has allegedly been controlled by Quivus directors Prince Bander Bin

Abdulla Bin Mohammed Al-Saud ("Prince Bander"), Tahir Rashid, and Sasa Petrovic. (*Id.* at ¶

11) Prince Bander serves as Chairman of Quivus' board and is also the owner of a majority of

Soroof's outstanding shares. (*Id.*) Mr. Rashid is the Chief Operating Officer of Soroof. (*Id.*)

And Mr. Petrovic, who currently serves as CEO of Quivus, is said to be "beholden to Soroof for

his position at Quivus and [his] salary." (*Id.*)

After removing Harrison, Soroof and Quivus (which was now "controlled by Soroof")

filed suit against Harrison in the Superior Court for the District of Columbia (the "DC Action")

on July 6, 2015 for "breaches of [Harrison's] duties to Quivus." (*Id.* at ¶¶ 1-2; *see also* D.I. 6-1

at 4) The DC Action "triggered [] Harrison's right to advancement [of his legal fees and

expenses in connection with suits against him for alleged breach of duties to Quivus] under the

Quivus operating agreement." (Complaint at ¶ 2) Harrison requested advancement from Quivus

but was rejected. (*Id.*)

In a March 4, 2016 letter rejecting Harrison's advancement demand, Quivus claimed that

it did not have the financial capacity to advance funds to Harrison. (*Id.* at ¶ 15 & n.1) Following

Quivus' rejection of Harrison's advancement demand, on March 7, 2016, Harrison commenced suit (the "Advancement Action") against Quivus in the Delaware Court of Chancery ("Chancery Court"). (*Id.* at ¶ 2; D.I. 6-1 at 4)

Harrison alleges that it is not a coincidence that the "'downturn'" in Quivus' financial status, which rendered it unable to pay its advancement obligations, "occurred around the same time that [] Harrison commenced the Advancement Action in March 2016." (Complaint at ¶ 15) Harrison claims that Quivus' suggestion that it was unable to advance these monies is suspicious, given that "Quivus reported over $2.3 million in revenue in 2015 (a full year after Soroof removed [] Harrison as CEO) and an increase in assets in 2015 over 2014[.]" (*Id.*)[2]

On August 23, 2016, Harrison obtained an Order in the Advancement Action (the "August 23, 2016 Order") "holding that he was entitled to advancement . . . of certain fees and expenses incurred in the DC Action and requiring Quivus to indemnify [him] for all of his fees in pursuing the Advancement Action." (*Id.* at ¶ 2) However, Quivus did not advance Harrison these funds nor indemnify him, as required by the August 23, 2016 Order. (*Id.* at ¶ 3) This caused Harrison to file a motion for contempt, which the Chancery Court subsequently granted. (*Id.* at ¶¶ 3-4) In doing so, the Chancery Court ordered Quivus to pay Harrison's counsel in the DC Action $259,071.88, ordered Quivus to pay Harrison's counsel in the Advancement Action $160,724.78, and awarded Harrison his fees for bringing the motion for contempt (later

---

[2]     Pursuant to the terms of the operating agreement, Soroof had initially provided Quivus with a $1.8 million interest-free loan to use as start-up capital. (Complaint at ¶ 19; D.I. 6, ex. A at § 6.1) Aside from that initial loan, "Quivus' sole source of revenue was from an agreement between Quivus and Soroof[,]" in which Quivus was "to supply technical services to Soroof to support Soroof's contract with the Royal Saudi Air Force[.]" (Complaint at ¶ 14; *see also id.* at ¶ 6)

4

determined to be $29,341.33). (*Id.* at ¶ 4) Additionally, the Chancery Court: (1) ordered that

Quivus disclose to it, *inter alia*, "the manner by which the fees and expenses incurred in defense

of the Advancement Action were paid"; and (2) ordered that Harrison was allowed "to propound

written discovery requests and take depositions in aid of execution." (*Id.* at ¶ 5)

Pursuant to the aforementioned order, Quivus "disclosed that all of the fees incurred in

defense of the Advancement Action had been paid by Soroof." (*Id.* at ¶ 6)[3] Also, in response to

discovery propounded in both the DC Action and the Advancement Action, Harrison learned that

"Soroof was the sole source of funding for Quivus." (*Id.*) More specifically, Harrison

discovered that Quivus' employees were either paid directly by Soroof, or were paid using funds

that Soroof would transfer to a "Quivus Special Account" maintained by Kalbian Hagerty LLP

("Kalbian Hagerty"), a law firm that is representing Soroof and Quivus in the DC Action (and

that represents Soroof in the instant action). (*Id.* at ¶¶ 6, 17) With regard to the latter payment

method, a Soroof employee would direct Kalbian Hagerty how much to pay Quivus' employees

and would wire that money to the firm; in turn, the firm would provide the funds and payment

instructions to Quivus' payroll administrator. (*Id.* at ¶¶ 6, 17) Kalbian Hagerty also used monies

obtained from Soroof to pay other invoices submitted to Quivus. (*Id.* at ¶ 18)

Although it complied with the disclosure and discovery requirements ordered by the

Chancery Court, Quivus ultimately did not make the payments to Harrison that had been ordered

by the Chancery Court. (*Id.* at ¶ 7) Consequently, on December 22, 2016, Harrison filed a

motion for leave to file an amended complaint in the Advancement Action, wherein he sought to

---

[3]     Soroof also paid Quivus' fees and expenses in the DC Action. (Complaint at ¶
16)

5

add Soroof as a party and "obtain a declaration that Soroof was responsible for Quivus' obligations under a veil piercing theory." (*Id.*) Additionally, on January 10, 2017, Harrison filed a second motion for contempt against Quivus in the Advancement Action, wherein Harrison again sought to compel payment of the funds owed to him by Quivus and to be appointed receiver of Quivus. (*Id.*)

The Chancery Court agreed to hear argument on both motions and scheduled the hearing for March 10, 2017. (*Id.*) Four days prior to the hearing, the Chancery Court asked the parties to reschedule the hearing to March 9, 2017; Quivus' attorneys advised that they were unable to do so, but provided other dates when they were available. (*Id.* at ¶ 8) Then, on March 8, 2017, two days prior to the originally-scheduled hearing, "Quivus filed a petition for bankruptcy protection under Chapter 7 of the Bankruptcy Code" (the "Bankruptcy Action") in the United States District Court for the District of Columbia (the "Bankruptcy Court"). (*Id.*)

## B.    Procedural Background In the Instant Case

Harrison initially filed the instant suit against Soroof in the Chancery Court on March 13, 2017. (Complaint at 1) On April 26, 2017, Soroof filed a notice of removal in this Court on the basis of diversity of citizenship. (D.I. 1) The parties thereafter jointly consented to the Court's jurisdiction to conduct all proceedings in the case, including trial, the entry of final judgment, and all post-trial proceedings. (D.I. 8)

Soroof filed the instant Motion in lieu of answering on May 17, 2017, (D.I. 6), and briefing was completed on July 6, 2017, (D.I. 10). Harrison thereafter filed additional submissions regarding: (1) a potentially relevant motion filed in the Bankruptcy Action (relating to the Chapter 7 Bankruptcy Trustee's request that Soroof be permitted to purchase Quivus'

6

claims against Harrison), (D.I. 13); (2) potentially relevant decisions in the Bankruptcy Action and DC Action, (D.I. 18); and (3) additional legal authority supportive of its position, (D.I. 19).

The Court granted oral argument on the Motion, which was held on January 17, 2018. (D.I. 20 (hereinafter, "Tr.")) However, at oral argument, it became clear that a key (and perhaps *the* key) issue regarding the Motion was whether Harrison's alter ego claim is the property of Quivus' bankruptcy estate (and, thus, whether Harrison has standing to bring that claim here). Yet that issue was addressed in only a few pages of the parties' pre-hearing briefing, and a number of the important cases on the subject were not referenced therein.

Thus, on January 18, 2018, the Court ordered supplemental briefing on the standing issue. Supplemental briefing was completed by February 2, 2018. (D.I. 23) The parties have stipulated to a stay of the action pending the Court's decision on the Motion. (D.I. 27; D.I. 28)

## II.    DISCUSSION

Harrison asserted three counts against Soroof in his Complaint: (1) Count I, which seeks a declaration that Quivus is the alter ego[4] of Soroof; (2) Count II, which seeks an order requiring payment of the monies that the Chancery Court previously ordered that Quivus pay to Harrison in the Advancement Action, as well as the payment of other outstanding amounts owed (the "advancement claim"); and (3) Count III, a claim for Harrison's fees in enforcing his advancement award ("fees on fees"). (Complaint at 14-17)

With its Motion, as noted above, Soroof makes three arguments as to why this action

---

[4]     Delaware courts use the terms "piercing the corporate veil" and "alter ego" theory interchangeably. *See Winner Acceptance Corp. v. Return on Capital Corp.*, Civil Action No. 3088-VCP, 2008 WL 5352063, at *5 n.32 (Del. Ch. Dec. 23, 2008). The Court will use both terms here as well, but will predominantly refer to Harrison's claim as an "alter ego" claim.

should be dismissed: (1) Harrison failed to state a claim sufficient to establish that Soroof is the alter ego of Quivus; (2) the Court lacks personal jurisdiction over Soroof; and (3) Harrison's alter ego claim is the property of the Quivus bankruptcy estate and thus assertable only by the Bankruptcy Trustee (i.e., Harrison lacks standing to bring that claim here).[5] (D.I. 6-1 at 1)

The parties agree that Harrison's standing to bring the alter ego claim is a threshold issue, in that, if Harrison lacks standing to assert that claim, then this would moot Soroof's other two bases for relief. (Tr. at 5, 9-12, 36, 54, 59-60; D.I. 21 at 4) Thus, the Court will address that issue first.

### A.    Standing to Assert the Alter Ego Claim

#### 1.    Standard of Review

The parties' briefing did not provide much guidance as to what standard the Court should use in deciding the standing issue. For example, the parties did not address who bears the burden of proof as to this issue, nor which Federal Rule of Civil Procedure applies to the question. It turns out that there is a considerable difference of opinion among federal courts on these questions.

---

[5]        Soroof switches between arguing that *all* of Harrison's claims are property of the Quivus bankruptcy estate, (D.I. 6-1 at 1-2, 5, 20; D.I. 10 at 3-4; D.I. 21 at 4; D.I. 23 at 2; Tr. at 5), and that only the alter ego claim is property of the estate, (D.I. 6-1 at 3, 19-20; D.I. 10 at 1; D.I. 21 at 2-4; D.I. 23 at 1-2; Tr. at 5, 8-9, 36). However, at oral argument, counsel for Soroof admitted that the advancement claim and claim for fees on fees were individual claims and thus like any other claims asserted by creditors in the Bankruptcy Action. (Tr. at 14-15) This distinction does not impact the ultimate outcome of the Motion, as if Harrison is unable to assert his alter ego claim due to lack of standing, his other claims fail because they are both dependent on the finding that Soroof is the alter ego of Quivus. (D.I. 6-1 at 1; D.I. 9 at 2; D.I. 21 at 4; *see also* Complaint at ¶ 35 ("Because there is no distinction between Soroof and Quivus, Soroof should be ordered to pay [] Harrison the outstanding amounts *owed to him by Quivus*.") (emphasis added))

Generally, "'Federal Rule of Civil Procedure 12(b)(1) [is the rule that] authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff *lacks standing* to bring his claim.'" *Arneault v. Diamondhead Casino Corp.*, 277 F. Supp. 3d 671, 674-75 (D. Del. 2017) (quoting *Samsung Elecs. Co. v. ON Semiconductor Corp.*, 541 F. Supp. 2d 645, 648 (D. Del. 2008)) (emphasis added); *see also Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."). Motions under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction and/or standing to hear a case. *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000). A facial challenge is based "purely on the sufficiency of the allegations in the complaint" and is reviewed under the same standard as a Rule 12(b)(6) motion—i.e., "the Court must accept well-pled factual allegations as true and may consider only the complaint and any documents referenced therein or attached thereto." *Arneault*, 277 F. Supp. 3d at 675.[6] On the other hand, a factual challenge to standing attaches no presumption of truthfulness "to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Additionally, a factual challenge puts the burden of proof on the plaintiff. *Id.* (explaining that a *facial* attack to jurisdiction under Rule 12(b)(1) "offer[s] similar safeguards to the plaintiff" as does a Rule 12(b)(6) motion, which places the burden on the moving party, as

---

[6]        *See also In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) ("In reviewing facial challenges to standing, we apply the same standards as on review of a motion to dismiss under Rule 12(b)(6). . . . Consequently, [as to a facial challenge] we accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor.") (internal citation omitted).

9

compared to a *factual* attack to jurisdiction which places the burden of proof on the plaintiff); *see also Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006).

However, when it comes to a challenge to a party's standing to bring a claim that may be the property of the bankruptcy estate, there is a lack of uniformity in the courts about whether Rule 12(b)(1) or Rule 12(b)(6) applies to that question. *Compare In re Student Fin. Corp.*, 334 B.R. 776, 777-79 (D. Del. 2005) (dismissing a bankruptcy trustee's tort claims for lack of standing pursuant to Rule 12(b)(6)), *with In re Student Fin. Corp.*, 335 B.R. 539, 546-47 (D. Del. 2005) (declining to dismiss, pursuant to Rule 12(b)(1), a bankruptcy trustee's breach of fiduciary duty claim for lack of standing); *cf. Umbenhauer v. Woog*, No. CIV. A. 90-5534, 1993 WL 134761, at *1-2 (E.D. Pa. Apr. 28, 1993) (evaluating the standing of creditors to bring certain causes of action under Rule 12(b)(6)). It seems that one reason why there is divergence on this front is that, when it comes to the issue of whether a creditor/debtor/bankruptcy trustee has standing to assert a particular claim, the Third Circuit views the issue as presenting a *prudential* standing question (as opposed to an Article III standing question).[7] A prudential standing question is one that implicates the requirement that a "'plaintiff [must] generally . . . assert his own legal rights and interests, and [] not rest his claim to relief on the legal rights or interests of third parties.'" *In re Majestic Star Casino, LLC*, 716 F.3d 736, 748 (3d Cir. 2013) (alterations in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). And while some courts have in

---

[7]     Soroof does not argue that Harrison lacks Article III standing to assert his claims—that is, it does not assert that Harrison has failed to allege "'(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.'" *Finkelman v. Nat'l Football League*, 877 F.3d 504, 510 (3d Cir. 2017) (quoting *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d Cir. 2016)).

fact evaluated prudential standing questions pursuant to Rule 12(b)(1), *see Acceleration Bay LLC v. Activision Blizzard, Inc.*, Civil Action No. 15-228-RGA, 2016 WL 3186890, at \*5 (D. Del. June 3, 2016) (dismissing an action pursuant to Rule 12(b)(1) because the plaintiff lacked prudential standing), others have taken the position that it is only appropriate to do so using Rule 12(b)(6), *see Elizabeth Retail Props., LLC v. KeyBank Nat. Ass'n*, 83 F. Supp. 3d 972, 985-86 (D. Or. 2015) ("While constitutional standing is evaluated under Rule 12(b)(1), prudential standing is evaluated under Rule 12(b)(6).").[8]

Fortunately for the Court, here it does not matter whether it proceeds under Rule 12(b)(1) or 12(b)(6). That is because there are no factual disputes that would warrant construing Soroof's motion as a factual challenge to Harrison's standing. Here, the Court has not been asked to (and does not need to) rely on any facts other than those: (1) found in the Complaint, (2) found in documents referenced in the Complaint, or (3) that are subject to judicial notice. Since the standard of review for a facial challenge to a party's prudential standing under Rule 12(b)(1) and that of a challenge pursuant to Rule 12(b)(6) is the same, the Court would employ the identical form of review regardless of which Rule applies. That is, the Court must accept Harrison's well-

---

[8]    Further adding to the confusion, in *Grede v. Bank of New York Mellon*, 598 F.3d 899 (7th Cir. 2010), the United States Court of Appeals for the Seventh Circuit found that the question of whether a bankruptcy trustee can assert a certain claim is not really a question of "standing" at all but, instead, a question on the merits as to whether the trustee has the legal "authority" to bring such a claim. *Grede*, 598 F.3d at 900. That type of merits-based challenge, brought at the pleading stage, would be reviewed under Rule 12(b)(6). *See Gecker v. General Elec. Capital Corp.*, No. 14 C 8447, 2015 WL 5086398, at \*6 (N.D. Ill. July 27, 2015) (evaluating a motion to dismiss over whether claims belong to the bankruptcy trustee or to a creditor under Rule 12(b)(6) because the motion concerned the parties' authority to pursue a certain cause of action, not a question of standing); *In re Glick*, 568 B.R. 634, 656 (Bankr. N.D. Ill. 2017) (same). Prior to *Grede*, the Seventh Circuit had described such a question as one implicating questions of "standing[.]" *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1341 (7th Cir. 1987).

11

pleaded factual allegations as true and draw all reasonable inferences from those allegations in

Harrison's favor.[9] Thus, below the Court will employ this standard and need not make a final

determination as to whether it does so pursuant to Rule 12(b)(1) or Rule 12(b)(6).

### 2. *In re Emoral, Inc.* and the Appropriate Legal Framework

The parties agree that the key case setting out the applicable legal framework here (i.e.,

for determining whether a non-debtor's claim is property of the bankruptcy estate) is *In re*

*Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014) ("*Emoral*"), *cert. denied sub nom.*, *Diacetyl Plaintiffs*

*v. Aaroma Holdings, LLC*, 135 S. Ct. 436 (2014). (D.I. 10 at 1 & n.1; D.I. 21 at 1; D.I. 22 at 1;

Tr. at 12-13, 54-55); *see also In re Maxus Energy Corp.*, 571 B.R. 650, 656 (Bankr. D. Del.

2017) ("*Emoral* provides the current Third Circuit framework for determining whether claims

predicated upon successor or alter ego liability against a third-party non-debtor constitute

property of the bankruptcy estate."). *Emoral* stated that:

> After a company files for bankruptcy, creditors lack standing to
> assert claims that are property of the [bankruptcy] estate. . . . The
> "estate," as defined in the Bankruptcy Code, includes "all legal or
> equitable interests of the debtor in property as of the

---

[9]      *See Van Sickle v. Fifth Third Bancorp*, No. 12-11837, 2012 WL 3230430, at *2
n.2 (E.D. Mich. Aug. 6, 2012) (noting that there was "no clear answer . . . in the case law"
regarding whether a motion to dismiss regarding a trustee's standing to pursue a claim should be
brought under Rule 12(b)(1) or Rule 12(b)(6), but finding that it "need not grapple with t[he]
question . . . [i]n the instant case" because there would be "no impact on the disposition of
[defendant]'s motion"); *In re 1031 Tax Grp., LLC*, 420 B.R. 178, 189 n.2 (Bankr. S.D.N.Y.
2009) ("It is unsettled in this Circuit whether it is appropriate to move to dismiss for lack of
standing under [Rule] 12(b)(6) or [Rule] 12(b)(1). . . . This does not change the Court's analysis
[because t]he standards governing motions to dismiss under both rules are substantially
identical.") (internal quotation marks and citations omitted); *cf. In re DSI Renal Holdings, LLC*,
574 B.R. 446, 478-79 (Bankr. D. Del. 2017) (finding that trustee did not have standing to assert a
veil-piercing/alter ego claim pursuant to Rule 12(b)(1) *and* Rule 12(b)(6)).

12

commencement of the case." 11 U.S.C. § 541(a)(1)).[10] This includes causes of action, which are considered property of the bankruptcy estate if the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law. . . . In order for a cause of action to be considered "property of the estate," the claim must be a general one, with no particularized injury arising from it. On the other hand, if the claim is specific to the creditor, it is a personal one and is a legal or equitable interest only of the creditor. A claim for an injury is personal to the creditor if the other creditors generally have no interest in that claim. . . .

A cause of action that is "property of the estate" is properly pursued by the trustee because it inures to the benefit of all creditors. This promotes the orderly distribution of assets in bankruptcy, and

---

[10]    In its briefing, Soroof never references or cites to 11 U.S.C. § 541 ("Section 541"). Instead, it cites to 11 U.S.C. § 544(b) ("Section 544(b)") in both its opening and reply briefs in support of its argument as to why the alter ego claim is the property of the Quivus bankruptcy estate. (D.I. 6-1 at 19; D.I. 10 at 1, 3-4) Section 544(b) grants a trustee the power to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable" under the Bankruptcy Code. 11 U.S.C. § 544(b). For at least two reasons, however, the Court finds that Section 541 is the appropriate section of the Bankruptcy Code to refer to here. First, the primary authorities on which Soroof relies, including *Emoral*, analyze whether a claim belongs to the bankruptcy estate pursuant to Section 541. *See, e.g.*, *Emoral*, 740 F.3d at 879; *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169-70 (3d Cir. 2002) (same); *In re OODC, LLC*, 321 B.R. 128, 136 (Bankr. D. Del. 2005) (same); *see also In re Icarus Holding, LLC*, 391 F.3d 1315, 1319 (11th Cir. 2004) ("Generally, courts that allow the trustee or debtor-in-possession to bring an exclusive alter ego action do so under [S]ection 541."); *but cf. Koch Ref.*, 831 F.2d at 1349 (suggesting that Section 544(a)—not Section 544(b)—may be relied upon to give a trustee standing to assert an alter ego claim). Second, there is a cogent argument that Section 544 does not provide the trustee authority to pursue claims like an alter ego claim. *In re Icarus Holding, LLC*, 391 F.3d at 1319 n.4 (explaining that using Section 544 as an alternative ground on which to allow trustees to assert alter ego claims as the representative of all creditors "is tenuous at best" because the purpose of Section 544 "is to give a trustee the power of a hypothetical lien creditor to avoid transfers of and liens on the debtor's property when the trustee cannot prevent them under other sections of the [B]ankruptcy [C]ode"); *see also In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1226 (8th Cir. 1987) (finding that Section 544 does not grant a trustee "the ability to litigate claims, such as the instant alter ego cause of action, on behalf of the debtor corporation's creditors"). For these reasons, and because Harrison asserts that Section 541 is the applicable code section, (Tr. at 54, 60), the Court will proceed with its analysis by looking to that section.

13

comports with the fundamental bankruptcy policy of equitable
distribution to all creditors that should not be undermined by an
individual creditor's claim. . . . As the Second Circuit has held,
when examining "common claims against the debtor's alter ego or
others who have misused the debtor's property in some fashion,"
where a claim is a general one, with no particularized injury arising
from it, and if that claim could be brought by any creditor of the
debtor, the trustee is the proper person to assert the claim, and the
creditors are bound by the outcome of the trustee's action."

*Emoral*, 740 F.3d at 879 (certain internal quotation marks omitted, citations omitted).

Although the parties agree that *Emoral* sets out the applicable legal framework, they

disagree about exactly what that framework requires. Soroof's view is that, in order to

demonstrate that Harrison's alter ego claim is the property of the bankruptcy estate, *Emoral* only

requires a showing that *either*: (1) the claim "existed at the commencement of the [bankruptcy]

filing and the debtor could have asserted the claim on his own behalf under state law" *or* (2) the

claim is a "general claim" with "no particularized injury arising from it." (Tr. at 27) Harrison,

on the other hand, reads *Emoral* as requiring *both*: (1) that the claim existed at the time of the

bankruptcy filing and was assertable by the debtor under state law *and* (2) that the claim is a

"general" one. (D.I. 22 at 1)

Below, the Court assumes *arguendo* that the *Emoral* framework is properly construed as

being cumulative (not disjunctive), since both requirements are described in *Emoral* as hallmarks

of claims that are the property of the bankruptcy estate. *See In re Maxus Energy Corp.*, 571 B.R.

at 657-58 (noting that the parties disagreed as to whether the *Emoral* requirements were

cumulative or disjunctive and ultimately deciding that the requirements were cumulative); *cf. In

re Icarus Holding, LLC*, 391 F.3d 1315, 1319-20 (11th Cir. 2004) (stating that an alter ego claim

is properly brought by the bankruptcy trustee if it is "a general claim that applies equally to all

14

creditors" *and* "state law allows the corporate entity to bring an alter ego action against its principal"); *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 170 n.8 (3d Cir. 2002) ("[I]f, at the time of Twin's filing, Appellant's cause of action existed and was general, it would be the property of the bankruptcy estate and Appellant would lack standing to pursue the action."). It will thus analyze below whether Soroof has shown that both of these requirements have been met. In doing so, the Court will, *inter alia*, engage in further analysis of *Emoral* and the guidance set out in that case.

### 3. The Alter Ego Cause of Action Is Property of the Bankruptcy Estate

The parties agree that Delaware state law controls the analysis of Harrison's alter ego claim for purposes of applying the *Emoral* framework. (D.I. 22 at 1 n.1; D.I. 23 at 1) And the parties also agree as to the requirements for making out an alter ego claim under Delaware law. (D.I. 6-1 at 6-7; D.I. 9 at 10-11)

"Delaware courts will respect corporate formalities, absent a basis to 'pierce the corporate veil.' . . . One such basis is where a subsidiary is in fact a mere instrumentality or alter ego of its owner." *Microsoft Corp. v. Amphus, Inc.*, C.A. No. 8092-VCP, 2013 WL 5899003, at *6 (Del. Ch. Oct. 31, 2013) (internal quotation marks and citations omitted). "A subsidiary may be the alter ego . . . of its parent when the two operate[] as a single economic entity such that it would be inequitable for [a court] to uphold a legal distinction between them." *Id.* (internal quotation marks and citation omitted). In addition to the requirement that the two companies operate as a single entity, Delaware law also "requires that the corporate structure cause fraud or similar injustice." *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (internal quotation marks and citation omitted); *see also Theravectys SA v.*

*Immune Design Corp.*, C.A. No. 9950-VCN, 2014 WL 5500506, at *2 (Del. Ch. Oct. 31, 2014)

("The alter ego doctrine typically only applies when the use of 'the corporate form in and of itself

operates to serve some fraud or injustice.'") (citation omitted). "'Effectively, the corporation

must be a sham and exist for no other purpose than as a vehicle for fraud.'" *Mason v. Network of*

*Wilmington, Inc.*, No. Civ.A. 19434-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005)

(quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc.*, 752 A.2d at 1184).

With the contours of an alter ego claim now set out, the Court turns back to the two

requirements of the *Emoral* framework. Soroof argues that Harrison's Delaware alter ego claim

meets both requirements, and is thus property of the bankruptcy estate. (D.I. 10 at 1-2; D.I. 21 at

2, 4) Although the issue is a challenging one, and both sides made strong arguments, for the

reasons set out below, the Court agrees with Soroof.

> a. **The alter ego claim existed at the commencement of the**
> **Bankruptcy Action, and Quivus could have asserted the alter**
> **ego claim on its own behalf under Delaware law**.

According to *Emoral*, in order for Soroof to demonstrate that Harrison lacks standing to

assert his claim here, the first requirement is that the claim must have "existed at the

commencement of the filing" and that "the debtor [Quivus] could have asserted the claim on [its]

own behalf under state law." *Emoral*, 740 F.3d at 879 (internal quotation marks and citation

omitted).

As to whether Harrison's alter ego cause of action existed at the commencement of the

Bankruptcy Action, there is no controversy. Harrison does not dispute that it did. (*See* D.I. 22 at

1-2; *see also* D.I. 23 at 1-2 ("Plaintiff does not challenge that any veil piercing claim already

existed at the time of bankruptcy. Indeed, Plaintiff sought to pierce the veil in a [m]otion to

[a]mend filed in the Court of Chancery in December 2016—ten weeks before the bankruptcy case was filed.") (citing Complaint at ¶ 7))

Next, then, Soroof must demonstrate that Quivus could have asserted the alter ego claim on its own behalf against Soroof at the time of the filing of the bankruptcy petition. Soroof asserts that, pursuant to Delaware law, Quivus could have done so. In making this argument, it cites to federal court opinions that have interpreted Delaware law as permitting a corporation like Quivus to pierce its own veil. (D.I. 21 at 2-3; D.I. 23 at 1-2 & n.1 (citing cases))

Harrison, for his part, does not heavily contest this issue. While he does note that "*no Delaware state court* has addressed whether a subsidiary can pierce its own veil[,]" (D.I. 22 at 2 (emphasis added)), Harrison simply goes on to argue that "[e]ven if [a subsidiary] could [pierce its own veil pursuant to Delaware law], however, the second part of the *Emoral* test—the requirement that the claim must be a 'general' one, is not met and therefore [] Harrison's claim does not belong to the bankruptcy estate[,]" (*id.*).

Although Harrison does not fight hard as to this issue, the Court will still briefly examine the question. To start, Harrison appears to be correct that no Delaware state court has ever definitively stated that, under Delaware law, a corporation may pierce its own corporate veil.[11]

---

[11]     The Court is aware of at least one case, however, where the Chancery Court discussed the issue. In *Case Fin., Inc. v. Alden*, Civil Action No. 1184-VCP, 2009 WL 2581873 (Del. Ch. Aug. 21, 2009), the plaintiff corporation attempted to assert direct claims against its former President and Chief Executive Officer ("CEO"), who was also a former CEO of plaintiff's wholly owned subsidiary. *Case Fin., Inc.*, 2009 WL 2581873, at *1-2, *4. The defendant argued that the "allegedly improper conduct at issue in th[e] litigation occurred at [the subsidiary], and not [the parent corporation]. Thus, according to [the defendant], [the parent] lack[ed] standing to bring th[e] action against him." *Id.* at *4. In response, the parent corporation attempted to "pierce its own corporate veil" by arguing that it and the subsidiary were alter egos and "really the same company," such that it would have standing to bring direct claims against the defendant. *Id.* The *Case Fin.* Court, while noting that it would be "unusual to

17

When a state court has not ruled on an issue such as this, it is then up to the federal court applying that state's law to "*predict* how [the state's highest court] would decide the issue were it confronted with the problem." *Jaworowski v. Ciasulli*, 490 F.3d 331, 333 (3d Cir. 2007) (alteration in original) (emphasis added).[12]

As Soroof has correctly noted, a number of federal district courts have made this kind of prediction, and all have concluded that the Delaware Supreme Court would allow a subsidiary to self-pierce its corporate veil to reach its parent. *See, e.g.*, *MC Asset Recovery, LLC v. Southern Co.*, Civil Action No. 1:06-CV-0417-BBM, 2006 WL 5112612, at *10 (N.D. Ga. Dec. 11, 2006) (agreeing that "Delaware law [would] permit such causes of action by a corporation to pierce its own corporate veil"); *In re iPCS, Inc.*, 297 B.R. 283, 297 (Bankr. N.D. Ga. 2003) (finding that "Delaware law would allow a debtor-in-possession [or trustee] to pursue" an alter ego cause of action); *In re Enron Corp.*, No. 01 B 16034(AJG), 2003 WL 1889040, at *3 (Bank. S.D.N.Y. Apr. 17, 2003) (noting that, because "Delaware law allows a subsidiary to maintain an action against a corporate parent, courts have found that a Delaware court would permit a debtor

say the least" for a corporation to seek to pierce its own corporate veil, did not dismiss the claim out of hand on that ground. *Id.* Instead, it proceeded to evaluate the merits of the plaintiff's alter ego argument, ultimately determining that the plaintiff had failed to meet its burden to show that it was the alter ego of its subsidiary. *Id.* at *4-5. The way the *Case Fin.* Court went about its analysis, then, at least provides some inferential support for the idea that under Delaware law a corporation may pierce its own corporate veil.

[12]     It is not surprising that Delaware state courts have not explicitly decided the issue at hand. This is because, outside of the bankruptcy context, "'defendants who so completely dominate the corporation as to constitute its alter ego are not likely to institute an action to determine their own liability for corporate debts.'" *In re Bldgs. by Jamie, Inc.*, 230 B.R. 36, 42-43 & n.3 (Bankr. D.N.J. 1998) (quoting *In re W. World Funding, Inc.*, 52 B.R. 743, 784 (Bankr. D. Nev. 1985)); *cf. Emoral*, 740 F.3d at 881 (noting that "it is difficult to image a factual scenario in which a solvent Emoral, outside of the bankruptcy context, would or could bring a claim for successor liability against Aaroma").

18

corporation to assert a claim to pierce its own corporate veil"); *Pereira v. Cogan*, No. 00 CIV. 619(RWS), 2001 WL 243537, at \*19 (S.D.N.Y. Mar. 8, 2001) (finding that a corporate debtor under Delaware law could pierce its own veil), *rev'd on other grounds sub nom.*, *Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005); *Murray v. Miner*, 876 F. Supp. 512, 517 (S.D.N.Y. 1995). These courts have not analyzed the legal issue in great detail. But they have tended to rely on one or both of two lines of reasoning:

> (1) Under Delaware law, a subsidiary is often able to bring a claim for breach of fiduciary duty against its parent if the subsidiary has sustained liability to third parties as a result of the parent's control—and such a breach of fiduciary duty claim is similar in nature (and might invoke similar factual inquiries) to a claim that a parent used the subsidiary as its alter ego; and

> (2) The policy behind state law veil-piercing theories (like those utilized by Delaware law) is to use an equitable remedy to hold the party that has controlled and misused a corporation liable for the corporate obligations. This policy would be furthered were a subsidiary permitted to pierce its own corporate veil.

*See In re iPCS, Inc.*, 297 B.R. at 297; *Pereira*, 2001 WL 243537, at \*19; *Murray*, 876 F. Supp. at 516-17; *see also In re Maxus Energy Corp.*, 571 B.R. at 659.

Although the Court wishes it had more in they way of argument on this question, it is comfortable concluding that the Delaware Supreme Court would hold that Quivus had the ability to pierce its own veil. The Court is not only persuaded by reasoning of the courts referenced above, but also by some of the language found in the Third Circuit's *Emoral* decision.

In *Emoral*, individual plaintiffs asserted personal injury actions in New Jersey state court against Aaroma Holdings, LLC ("Aaroma"); the personal injury claims stemmed from the plaintiffs' chemical exposure to Emoral, Inc.'s ("Emoral") products. 740 F.3d at 877. Prior to

the plaintiffs' suits, Aaroma had purchased certain assets and assumed certain liabilities of Emoral, and Emoral had thereafter filed for bankruptcy protection. *Id.* In the bankruptcy proceeding, the bankruptcy trustee ("trustee") claimed, among other things, that the sale of Emoral's assets to Aaroma had constituted a fraudulent transfer. *Id.* The trustee and Aaroma later settled this dispute and the trustee "agreed to release Aaroma from any 'causes of action . . . that are property of the [Emoral bankruptcy estate]' as of the date of the [a]greement." *Id.* (citation omitted).

After this settlement, the plaintiffs in *Emoral* filed their suits against Aaroma in the Superior Court of New Jersey "alleging personal injury and product liability claims and asserting that Aaroma was a 'mere continuation' of Emoral and, therefore, liable." *Id.* Aaroma, for its part, asserted that the claims against it were barred by the prior settlement agreement that it had entered into with the bankruptcy trustee of Emoral's estate. *Id.* at 877-78.

As part of its analysis of whether the plaintiffs' New Jersey state law cause of action for successor liability was the property of Emoral's bankruptcy estate, the Third Circuit analogized a successor liability claim to one where a corporation sought to pierce its own veil. *Id.* at 881. The *Emoral* Court explained that in a prior case also involving New Jersey state law, *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228 (3d Cir. 1994), it had observed that while it "'may seem strange' to allow a corporation to pierce its own veil, 'since [such a corporation] cannot claim to be either a creditor that was deceived or defrauded by the corporate fiction, or an involuntary tort creditor[,]' . . . in New Jersey *and in other states*, 'piercing the corporate veil and alter ego actions are allow to prevent unjust or inequitable results'" and that "because a veil-piercing cause of action is 'based upon preventing inequity or unfairness, it is not incompatible with the

20

purposes of the doctrine[] to allow a debtor corporation to pursue a claim based upon such a theory.'" *Id.* (quoting *Phar-Mor, Inc.*, 22 F.3d at 1240 n.20) (emphasis added)).[13]

To be sure, *Emoral* (and *Phar-Mor*) were cases interpreting New Jersey state law. But the way *Emoral* discussed the general nature of an alter ego claim indicates that *the Third Circuit* would predict that, under Delaware law, a subsidiary like Quivus would have the ability to pierce its own corporate veil. That has influenced the Court's thinking here too.

For the foregoing reasons (and in light of Harrison's lack of argument to the contrary), the Court is persuaded that the instant alter ego claim existed at the commencement of Quivus' bankruptcy filing, and that Quivus could have then asserted an alter ego claim on its own behalf under Delaware state law. The Court thus proceeds to assess the applicability of the second of *Emoral*'s two requirements.

<b>b.     The alter ego claim is a "general" claim.</b>

The second *Emoral* requirement is that the claim at issue be "a general one, with no particularized injury arising from it." *Emoral*, 740 F.3d at 879 (internal quotation marks and citation omitted). The parties hotly dispute whether Harrison's alter ego claim is, in fact, a "general" claim.

In assessing this question, the Court will again turn back to the language of the Third Circuit's decision in *Emoral*. Thereafter, it will examine the remainder of the parties' arguments, keeping the *Emoral* decision and other similar cases in mind.

---

[13]     Delaware courts have repeatedly found that actions to pierce a corporate veil are equitable in nature. *See, e.g.*, *Medi-Tec of Egypt Corp.*, No. Civ.A. 19760-NC, 2004 WL 415251, at *2-3 (Del Ch. Mar. 4, 2004) (citing *John Julian Constr. Co. v. Monarch Builders, Inc.*, 324 A.2d 208, 210 n.1 (Del. 1974)); *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992).

### (1)   *Emoral*

In *Emoral*, as noted above, the plaintiffs' claims stemmed from exposure to Emoral's products. Emoral, though, had filed for bankruptcy protection in June 2011. *Emoral*, 740 F.3d at 877. In suing Aaroma in the Superior Court of New Jersey in 2011, the plaintiffs "alleg[ed] personal injury and product liability claims" on a successor liability theory—i.e., asserting that "Aaroma was a 'mere continuation' of Emoral and, therefore, liable." *Id.* The question in *Emoral*, then, was whether the plaintiffs' successor liability claims were the property of the bankruptcy estate (which would deprive the plaintiffs of standing) or not. As part of its analysis, *Emoral* also discussed the second part of the two-part framework discussed above: whether a successor liability claim was a "general one, with no particularized injury arising from it." *Id.* at 879.[14]

In doing so, the *Emoral* Court first emphasized that it "must examine the *nature of the cause of action itself*." *Id.* (emphasis added). While noting that the personal injury plaintiffs "focus[ed] on the individualized nature of their personal injury claims against *Emoral*," the *Emoral* Court explained that it could not "ignore the fact . . . that [the plaintiffs'] only theory of liability as against *Aaroma*, a third party that is not alleged to have caused any direct injury to [plaintiffs] is that, as a matter of state law, Aaroma constitutes a 'mere continuation' of Emoral such that it has also succeeded to all of Emoral's liabilities." *Id.* (emphasis in original).

The *Emoral* Court then spelled out what was required under New Jersey state law to

---

[14]      The *Emoral* Court had determined that the first part of the framework was satisfied: that under New Jersey law, Emoral could have brought a claim for successor liability against Aaroma, 740 F.3d at 881, and that the claim existed at the commencement of the bankruptcy filing.

make out a successor liability claim. The Third Circuit explained that a successor liability claim under New Jersey law was an exception to the general rule that a company that purchases certain assets from another is not liable for the selling company's debts or liabilities. *Id.* at 879-80. In order to establish that this exception applies, and that the purchasing company should be seen as the "mere continuation" of the selling company, "a plaintiff must 'establish that there is continuity in management, shareholders, personnel, physical location, assets[,] and general business operation between selling and purchasing corporations following the asset acquisition.'" *Id.* at 880 (citation omitted).

In the end, the *Emoral* Court determined that plaintiffs' successor liability claim under New Jersey law was a "general" claim. And in summarizing why this was so, the Third Circuit explained that the plaintiffs had failed to make either of two showings: (1) they had "fail[ed] to demonstrate how any of the factual allegations that would establish their cause of action based on successor liability are unique to them as compared to other creditors of Emoral"[15] and (2) they had likewise failed "to demonstrate how recovery on their successor liability cause of action would not benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities." *Id*.

Soroof argues that, just like the plaintiffs in *Emoral*, here Harrison's alter ego claim fails both of these two tests. In other words, Soroof argues that Harrison's claim: (1) involves factual allegations that are not unique to Harrison and that could be "relied on by all of Quivus[']

---

[15]    In stating this another way, the *Emoral* Court later noted that the plaintiffs' "cause of action against Aaroma would be based on facts generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors[,]" such that the claim was "appropriately classified [] as a generalized claim constituting property of the estate." *Emoral*, 740 F.3d at 881.

23

creditors" and (2) that "[a] finding that Soroof is an alter ego would benefit all creditors" of

Quivus, not just Harrison. (D.I. 21 at 2 (emphasis omitted)) Thus, below the Court will address

each of these two questions.

> **(2) Are the factual allegations that would establish
> Harrison's alter ego cause of action unique to him, as
> compared to other creditors of Emoral?**

The Court first assesses whether "the factual allegations that would establish [Harrison's

alter ego] cause of action are unique to [him], as compared to other creditors of [Quivus]."

*Emoral*, 740 F.3d at 880.

How does a court determine the answer to this question? We know from *Emoral* that, in

doing so, the Court should be focused on Harrison's alter ego claim itself—not Harrison's

underlying claim for advancement. *Id.* at 879. From there, the Court must look to the showing

required by Delaware law to "establish liability" as to this kind of a claim. *Id.* at 880. On that

score, as was previously noted, a Delaware alter ego claim has two elements: (1) have the two

companies (Quivus and Soroof) functioned as a single entity and thus should be treated as such,

and (2) has this corporate structure caused fraud, injustice, or unfairness? Would the factual

allegations used to establish these elements be "unique" to Harrison?

There is no dispute that as to the first element—whether Quivus and Soroof functioned as

a single entity—they would not be. After all, in order to assess whether two entities function as

one for purposes of the alter ego analysis, Delaware law asks courts to consider a number of

factors *about the parent and subsidiary companies, and their relationship to each other*,

including: "(1) whether the company [i.e., the subsidiary] was adequately capitalized for the

undertaking; (2) whether the company was solvent; (3) whether corporate formalities were

24

observed; (4) whether the dominant shareholder [i.e., the asserted alter ego of the company in question] siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Sprint Nextel Corp. v. iPCS, Inc.*, Civil Action No. 3746-VCP, 2008 WL 2737409, at *11 (Del. Ch. July 14, 2008); *see also Mason*, 2005 WL 1653954, at *3 (listing a similar set of factors relevant to the question). Just as with the successor liability claim in *Emoral*, the information that a court would consider as to this first element of the alter ego test (i.e., information about the nature of the Quivus/Soroof relationship) would not differ depending on which Quivus creditor was bringing an alter ego claim.

It is as to the second element of an alter ego claim, however (i.e., whether there was an element of fraud, injustice, or unfairness at play), where the *Emoral* analysis gets a bit more difficult. Here, Harrison *does* argue that the relevant factual allegations would be "unique" to him. (Tr. at 66 (Harrison's counsel arguing that "there's also a second part of that alter ego analysis that talks about it being a fraud or an injustice or ine[quity] and not all the creditors are going to be able to meet that second part of that test"))

This "fraud, injustice, or unfairness" element has at times been criticized for being "less than clear" in what it requires. *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 151 (S.D.N.Y. 2012) (internal quotation marks and citations omitted) (reviewing Delaware law). Nevertheless, certain parameters have been set out. For example, while any party that brings a legal claim (e.g., for breach of contract, or in tort) against a purported alter ego company can assert that an "injustice" is being done to them (e.g., based on the facts that give rise to their claim for breach of contract, or their tort claim), that is not the kind of "injustice" that is relevant. *See Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del.

Super. Ct. 1996); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) (interpreting Delaware law); *Medi-Tec of Egypt Corp.*, 2004 WL 415251, at *4. Instead, Delaware law requires that the fraud or injustice be found in the *defendant's use of the corporate form itself. Soroof Trading Dev. Co.*, 283 F.R.D. at 151; *Medi-Tec of Egypt Corp.*, 2004 WL 415251, at *4; *cf. Mobil Oil Corp.*, 718 F. Supp. at 268.

Moreover, under Delaware law, the "same facts used to show that the business entities operated as a single enterprise can lend the requisite fraud or inequity." *Soroof Trading Dev. Co.*, 283 F.R.D. at 151 (citing cases).[16] In other words, a plaintiff making an alter ego claim can argue that the very same factual allegations it uses to show a lack of corporate separateness (by which the parent corporation used a subsidiary for its own purposes) demonstrate why it would also be an injustice for the parent to absolve itself from liability as to the plaintiff's claim against the subsidiary.

Are Harrison's allegations regarding the "fraud, injustice, or unfairness" element unique to him, as compared to other Quivus creditors? In some sense, Harrison might credibly assert that they are. After all, in any such plaintiff's *particular* case (like Harrison's), the parent's actions in assertedly ignoring the corporate form may have caused the subsidiary to fail to pay or default on obligations relating to a *specific* loan, or business transaction, or legal controversy—*specific* in the sense that the loan/transaction/controversy involves the subsidiary

---

[16]     *Cf. Forsythe v. CIBC Emp. Private Equity Fund (U.S.) I, L.P.*, No. Civ.A. 657-N, 2005 WL 1653963, at *7 (Del. Ch. July 7, 2005) (finding that the plaintiffs had failed to satisfy the "fraud or injustice" prong, because they supplied "no evidence . . . that there was pervasive disregard of corporate formalities" by defendant to use its alleged alter ego to off-load non-performing investments in a manner that would harm plaintiffs or other entities) (internal quotation marks omitted).

and that *particular* plaintiff (and perhaps no other entity). Moreover, such a plaintiff might argue

that the motive for the parent's wrongful use of the alter ego was primarily, or even exclusively,

*specific* to it—that is, that the parent was engaging in this abuse of the corporate form for the

*specific* purpose of harming that *particular* plaintiff. If there are facts in the relevant complaint

going to all of this asserted specificity or particularity, a plaintiff is going to point to those facts

and argue that they are unique to it (as compared to other creditors).

　　　Indeed, that is in part how Harrison tries to frame his alter ego claim. In his Complaint,

Harrison asserts that Soroof perpetrated an "injustice" and a "fraud on this Court[,]" (Complaint

at ¶¶ 16, 24), in order to accomplish the following plan:

> (1) Soroof sought to "ke[ep] Quivus alive" as a corporate entity by
> funding certain of Quivus' expenses, and Soroof "did this because"
> it wanted Quivus' claims for breach of fiduciary duty against
> Harrison to remain viable in the DC Action;
>
> (2) At the same time, Soroof made it look like Quivus "had no
> money to pay Mr. Harrison." It underfunded Quivus and used
> separate accounts not in Quivus' control to pay Quivus expenses. In
> light of this, and because Quivus is a separate corporate entity from
> Soroof, Quivus could assert that it was unable to pay Harrison the
> fees and costs it owed him in the DC Action and Advancement
> Action, all while;
>
> (3) Soroof and Quivus continued to cause Harrison and his counsel
> to expend additional monies in those two actions.

(Complaint at ¶¶ 16, 21-24, 27; *see also* D.I. 9 at 8; Tr. at 67-69) The way these allegations are

phrased make them sound as if they relate to a Quivus/Soroof plan that is very *particular* to

Harrison—one whose motive was to injure Harrison *specifically*.

　　　But on the other hand, in alter ego cases like this one, the creditor plaintiff is likely to be

relying on facts to make out the "fraud or injustice" element that are really not unique to only that

27

plaintiff. In such cases, the plaintiff would cite to certain coordinated acts taken by the parent and/or the subsidiary that not only caused harm to that plaintiff but *also* to other creditors of the subsidiary.

Indeed, the instant Complaint includes numerous allegations of this type. In describing how "Soroof's use of Quivus as a purportedly separate entity perpetrated a fraud[,]" (Complaint at ¶ 16), the Complaint references many allegations about how, exactly, Soroof accomplished this—allegations that are not particular to Harrison. For example, the Complaint sets out how Soroof controls Quivus' operations and management through the efforts of Quivus' remaining board members, (*id.* at ¶ 11), and how Soroof rarely follows the terms of the operating agreement, (*id.* at ¶ 12). It describes how Soroof ordered Quivus to stop pursuing a potentially lucrative contract so that Soroof could pursue it instead. (*Id*. at ¶ 13) It alleges that, although Quivus reported over $2.3 million in revenue in 2015, its financial status deteriorated and, as early as March 2016, Quivus stated "that it did not have the financial capacity to advance funds to [] Harrison." (*Id*. at ¶ 15) And there are paragraphs of allegations explaining how Soroof helped fund Quivus' existence while keeping money off of Quivus' books, all so that no such funds could be "attached or seized by" Quivus creditors (including Mr. Harrison). (*Id.* at ¶ 20) These include allegations that Soroof provided funds to cover some of Quivus' expenses, such as employee salaries, "employee health insurance plans, business and workers['] compensation insurance, accounting services, internet services[,] and franchise taxes." (*Id.* at ¶¶ 17-18) This money was not provided directly to Quivus, but rather was deposited into an account managed by

counsel for Soroof and Quivus, to then be distributed directly for the relevant expenses.[17] (*Id.*) The Complaint alleges that Quivus had no obligation to pay these monies back to Soroof. (*Id.* at ¶ 19)

These same factual allegations could have been made by any number of different Quivus creditors to help show that, based on Soroof's conduct, those creditors too would suffer an injustice were Quivus' corporate veil not pierced. Indeed, at one point in his Complaint, Harrison suggests just that. He notes that, had Soroof paid Quivus "the appropriate amounts" that it should have pursuant to the Quivas/Soroof operating agreement, then "Quivus would have been able to *pay all of its creditors*, including [] Harrison." (Complaint at ¶ 19 (emphasis added); *see also id.* at ¶ 30 (Harrison alleging, in Count I's alter ego claim, that "Soroof did not pay the additional funds to which Quivus was entitled under their agreement, which caused Quivus to be undercapitalized and an entity in name only"); D.I. 23 at 2 (Defendant arguing that "[l]ike Harrison, [other creditors] continued to do business with Quivus Systems in the belief that they ultimately would be repaid, and their 'right[s] to [recovery under their respective claims] will [also] be eviscerated' unless they somehow succeed in making Soroof pay another's debts") (alterations in original))

Again, both parties make good arguments about whether to view the allegations here as "particularized" (Harrison's view) or "general" (Soroof's view). In the end, for two primary reasons, the Court believes that Soroof's position is the correct one.

First, in the sections of the Complaint that most directly relate to the alter ego allegations,

---

[17]     Additionally, it is alleged that some Quivus employees were paid directly by Soroof, purportedly because those employees did not have a bank account in the United States. (Complaint at ¶ 17)

the majority of the facts pleaded strike the Court as "general" allegations—those that any number of Quivus' creditors might use to show that Quivus and Soroof are each other's alter ego. In the body of the Complaint, for example, the sections most directly relating to the alter ego claim ("Soroof Controlled Quivus Operationally and Financially" and "Soroof Used its Control to Harm Mr. Harrison and This Court") are predominantly comprised of such factual assertions. (Complaint at ¶¶ 11-15, 17-20, 26)  Even more notably, nearly every additional factual allegation in Count I—the alter ego count itself—fits this bill.  The factual averments there simply describe how Soroof dominated Quivus' board, failed to observe corporate formalities vis-a-vis Quivus, caused Quivus to be undercapitalized, and sent a letter on its own letterhead terminating Quivus' employees.  (*Id.* at ¶¶ 29-31)  None of those allegations particularly have to do with Harrison. *Cf. In re Landmark Fence Co.*, No. ED CV10-00143-AHM, 2010 WL 4924739, at *4 (C.D. Cal. Dec. 3, 2010) (finding that an alter ego claim brought by individual creditors against the debtor's principal under California law, which purportedly allowed for both "generalized" and "particularlized" alter ego claims, was a "general" claim and the property of the bankruptcy estate, where the "vast majority" of the allegations in the complaint regarding the alter ego claim related to evidence that "affect[ed] all creditors equally") (citing cases).

Second, categorizing the claim as one containing allegations that are not "unique" to Harrison best aligns with the Third Circuit's analysis in *Emoral*.  There, in discussing this issue, *Emoral* cited in part to a prior decision by the United States Bankruptcy Court for the District of New Jersey: *In re Buildings by Jamie, Inc.*, 230 B.R. 36 (Bank. D.N.J. 1998).  The *Emoral* Court noted that in *Buildings by Jamie*, a debtor's individual creditors were found to lack standing to bring an alter ego cause of action under New Jersey law.  And in applying the result in *Buildings*

*by Jamie* to the standing issue before it, the *Emoral* Court went on to state that "[a]s in . . .

*Buildings by Jamie*, [here] the Diacetyl Plaintiffs' cause of action against Aaroma *would be*

*based on facts generally available to any creditor*[.]" *Emoral*, 740 F.3d at 881 (emphasis

added). This is important because the factual allegations regarding the alter ego claim in

*Buildings by Jamie* were really not all that different from Harrison's allegations in this case.

     In *Buildings by Jamie*, the debtor, Buildings By Jamie, Inc. ("the debtor"), was a "close

corporation in which Jamie Jones ('Mr. Jones') [was] the president and sole shareholder."

*Buildings by Jamie*, 230 B.R. at 38. The debtor entered into a contract with 751 Partners Group

("751 Partners"), a company formed for the purpose of buying and selling real estate, "whereby

[751 Partners] agreed to sell the debtor lots on which the debtor agreed to construct homes for

sale to third parties in a development known as 'Waltham Woods.'" *Id.* "The contract provided

that upon the sale of each lot to a third party[,] the debtor was to make a payment to 751

Partners." *Id.* Between 1987 and 1989, Thomas Skeuse, one of 751 Partners' owners, "loaned

the debtor nearly $475,000 from the bank accounts of 751 Partners, Skeuse Realty[,] and

Springwater Farms for use exclusively in the construction of Waltham Woods." *Id.*

Additionally, Reagent Chemical & Research, Inc. ("Reagent"), a company owned by Mr. Skeuse

and his wife Rita, guaranteed $500,000 worth of loans from a trust company used to facilitate the

debtor's construction. *Id.* at 39.

     In February 1991, Mr. Jones notified the creditors—consisting of 751 Partners, Skeuse

Realty, Rita Skeuse as trustee of Thomas Skeuse, Springwater Farms, and Reagent—that the

approval for sewer permits at Waltham Woods had been revoked. *Id.* at 38. It was alleged that

the debtor had taken the above-referenced loans from the creditors even though, at the time, Mr.

31

Jones knew that these permits were at risk of being revoked. *Id.* After the permits were reinstated in September 1992, Mr. Jones, on behalf of the debtor, refused to perform the remainder of the contract. *Id.* at 39.

In March of 1993, the debtor sold the last remaining home at Waltham Woods to a third party. *Id.* Mr. Jones allegedly transferred the $270,000 proceeds of that sale for no consideration to Jamie, Inc.—a company owned and operated by Mr. Jones that "was engaged in a business virtually indistinguishable from the debtor's business[,]" including being operated from the same location as the debtor, using the same employees, and featuring Mr. Jones as the sole shareholder and officer. *Id.* Jamie, Inc. then transferred $100,000 to Mr. Jones (and his wife, Ann Jones) for no consideration. *Id.* Another $10,000 transfer from the debtor to Jamie, Inc. occurred in 1995, again for no consideration. *Id.* In addition, between May and November 1990, "the debtor [had] transferred all of its cash and several thousand dollars worth of assets to Jamie, Inc. for no consideration." *Id.* After commencement of the bankruptcy action, "Mr. Jones [next] transferred all of the assets of Jamie, Inc. to Just Jamie, Inc. [a real estate developer operated by its sole principal, Mr. Jones] for no consideration." *Id.* It was also alleged that the loan of $500,000 guaranteed by Reagent was used for the Joneses' personal benefit, "including construction of their personal residence, purchase of real property[,] and renovation of business property." *Id.*

The trustee and the creditors filed an adversary complaint against defendants consisting of the debtor, Jamie, Inc., Mr. Jones, Mrs. Jones, Mrs. Jones' brokerage company, and Just Jamie, Inc., alleging, *inter alia*, that: (1) certain of the above-identified transfers were fraudulent and (2) the corporate defendants and Mr. and Mrs. Jones should be held liable for the debtor's debts based on an alter ego theory. *Id.* at 39-40. In response, the defendants argued, *inter alia*, that the

32

trustee did not have standing to assert an alter ego claim under New Jersey law on behalf of the creditors because the claim was personal to the creditors. *Id.* at 40-41.

In determining whether the claim was property of the estate or personal to the creditors under Section 541(a)(1), the *Buildings by Jamie* Court first reviewed New Jersey alter ego law, which is similar to Delaware law on the subject. *Id.* at 41-42. The court noted that "[t]he principle is well settled in New Jersey that the doctrine of piercing the corporate veil is employed when fraud or injustice has been perpetrated." *Id.* at 42 (citing *Lyon v. Barrett*, 445 A.2d 1153, 1156 (N.J. 1982)). The court went on to discuss in more detail several decisions of New Jersey state courts which found, *inter alia*, that corporate principals were alter egos of their company because they had "defrauded" the minority shareholders through their "disregard of corporate formalities[.]" *Id.* It noted that courts in New Jersey "generally pierce [the veil] where such unity of ownership exists and where the corporation operates as an instrument of the shareholders' personal business such that failure to disregard the corporate entity would promote fraud." *Id.* at 42 (citations omitted).

Applying the aforementioned law, the *Buildings by Jamie* Court characterized the plaintiffs' position in the case as "rely[ing] specifically on the lack of corporate formalities among the debtor and nondebtor defendants as well as the free transferability of assets and the shared ownership, employees, location[,] and line of business." *Id.* at 40. And it ultimately found that the alter ego claim was a "general" claim, one properly asserted by the trustee. *Id.* at 43.

Important to the instant dispute, the *Emoral* Court could have framed the creditors' allegations in *Buildings by Jamie* as amounting to particularized allegations. That is, the *Emoral*

33

Court might have emphasized that the creditors' complaint was about a *particular* housing-related scheme by the Joneses and related entities to defraud these *particular* creditors out of money in various different ways. But instead, the *Emoral* Court described the *Buildings by Jamie* allegations as being "based on facts *generally available* to any creditor[.]" *Emoral*, 740 F.3d at 881 (emphasis added). Its focus, then, must have been less on the fact that in ignoring corporate formalities, the Joneses sought to harm any one particular creditor or creditors. Instead, the Third Circuit seems to have been framing the Joneses' abuse of the corporate form as actions that could also just as easily have been used to harm any or all other creditors as well.[18] Based on the way *Emoral* framed the allegations in *Buildings by Jamie*, it stands to reason that it would also frame the allegations here in the same way.

For these reasons, the Court concludes that the factual allegations that would establish Harrison's alter ego cause of action should not be viewed as being "unique" to him, as compared to other creditors of Quivus. This supports Soroof's position.

> **(3)** **Would Harrison's recovery on his alter ego cause of action benefit all creditors of Quivus?**

*Emoral* also asks whether "recovery on [Harrison's alter ego] cause of action would . . . benefit all creditors of [Quivus.]" *Emoral*, 740 F.3d at 880.

On this point, Harrison argues that his "alter ego claim, which arises out of the orders granting him advancement," would solely benefit him because the "claim for advancement is a

---

[18]    As it turns out, the plaintiff creditors who sued in *Buildings by Jamie* constituted the entire body of the debtor's creditors. *Emoral*, 740 F.3d at 881 n.3. But the Third Circuit in *Emoral* seemed to be saying that had their been other creditors in that case, the Joneses' actions at issue were generally of the type that such other creditors could have used to demonstrate alter ego liability.

specific contractual right that he has as the CEO of Quivus." (D.I. 22 at 3) Put another way, "Harrison seeks a finding of alter ego 'to hold Soroof liable for the financial obligations of Quivus under the [orders granting him advancement]'"—obligations that were all generated due to "Soroof's actions in directing Quivus to sue Mr. Harrison[,]" rendering any recovery "personal to Mr. Harrison." (*Id.* at 3 n.2 (citing Complaint at ¶ 32); *see also* D.I. 9 at 19-20 ("There can be no doubt that the relief [Harrison] is seeking—holding Soroof accountable for paying [] Harrison's attorneys' fees in the DC Action and Advancement Action—is [] individual [] and pleaded as such."); *id.* at 2 ("It is obvious from the Complaint that [] Harrison is pursuing an individual claim, and therefore can pierce the corporate veil and hold Soroof liable for Quivus' obligations to [] Harrison.")) In making this argument, Harrison is asking the Court to assess the relevant question (Would Harrison's recovery "benefit all creditors"?) by focusing on the particular dispute Harrison has with Quivus over advancement/reimbursement of fees and costs in the DC Action and the Advancement Action. (Tr. at 56-57 (Harrison's counsel arguing that, pursuant to Third Circuit decisions, courts "will actually look at the claim underlying the alter ego claim to make its decision" and noting that Harrison is only "asking for an alter ego declaration regarding specific claims, not a generalized claim"))

  *Emoral* makes it clear, however, that this is the wrong way to look at this issue. As previously noted above, the *Emoral* Court explained that "[w]hile the [personal injury plaintiffs in that case] focus on the individualized nature of their personal injury claims against" the debtor, the *Emoral* Court's analysis had to be on the plaintiff's "theory of liability as against

*Aaroma*"—the non-debtor (like Soroof here). *Emoral*, 740 F.3d at 879 (emphasis in original).[19]

Pursuant to *Emoral*, then, in analyzing whether recovery on the alter ego cause of action would

"benefit all creditors" of Quivus, the Court needs to be focused on the alter ego theory that

Harrison is using to extend liability to Soroof.

So, if Harrison recovered on that theory against Soroof, could that be said to "benefit all

creditors" of Quivus? Although the issue is not free from doubt, again the Court ultimately

agrees with Soroof that Harrison's claim, if successful, would "benefit all creditors" of Quivus.

It so concludes for a few reasons.

First, it is easy to see how alter ego claims could, as a general matter, be framed as

benefitting all creditors of a debtor. Once Quivus and Soroof are found by a court to be alter

egos of each other, that finding would certainly be helpful to other creditors. Those other

creditors should then have a much easier path to the extent they wished to bring a similar alter

ego claim against Soroof to recoup monies owed to them by Quivus.

Indeed, if Soroof is found to be an alter ego of Quivus, it may in fact be estopped from

arguing thereafter to the contrary. Numerous courts have indicated that a finding that one

---

[19]     *See also In re Tronox Inc.*, 855 F.3d 84, 103 (2d Cir. 2017) ("As did the *Emoral* majority opinion, we disagree with the dissenting opinion's focus on the nature of the [underlying tort cause of action that the plaintiff held against the debtor]. That the plaintiffs in *Emoral* had an underlying harm specific to them [i.e., personal injuries from exposure to a chemical] did not put the claims automatically outside the estate. Indeed, every creditor in bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort[,] contract, or otherwise."); *In re Maxus Energy Corp.*, 571 B.R. at 657 ("Despite the fact that the claims asserted by the plaintiffs were unique, as observed by both the majority and the dissent in *Emoral*,[] such that no other creditor could assert the specific claims stemming from successor liability alleged by the plaintiffs, the majority's opinion ultimately turned upon a distinction between the individualized nature of the underlying injury giving rise to the claims and the specific theory advanced by the plaintiffs to extend liability for their alleged cause of action.").

company is the alter ego of another may be subject to offensive issue preclusion/collateral estoppel. *See, e.g., In re Kohner*, Nos. 2:13-bk-02159-DPC, 2:13-bk-02161-DPC, 2014 WL 4823791, at *3 (Bankr. D. Ariz. Sept. 25, 2014) ("With alter ego findings, the [t]rustee could assert offensive collateral estoppel in the [a]dversary [p]roceeding to establish that the entities were alter egos of the [d]ebtors."); *In re Kilroy*, 357 B.R. 411, 428 (Bankr. S.D. Tex. 2006) ("Thus, this Court, under Delaware offensive collateral estoppel, can-and-does-hold that the [d]ebtor is estopped from denying that [the company] is his alter ego."); *see also Twin City Trades Serv. Assoc., Inc. v. Wenner Quality Servs., Inc.*, 869 F.3d 672, 676-78 (8th Cir. 2017) (affirming the district court's use of offensive collateral estoppel on the issue of alter ego liability).

Second, although Harrison relies heavily on *In re DSI Renal Holdings, LLC*, 574 B.R. 446 (Bankr. D. Del. 2017) ("*DSI Renal*") to show that his alter ego claim does not "benefit all creditors" of Quivus, the Court finds such reliance misplaced.

In *DSI Renal* the court found that the bankruptcy trustee did not have standing to assert certain veil piercing/alter ego claims "on behalf of the creditors of a pre-merger subsidiary." *DSI Renal*, 574 B.R. at 478-480. Specifically, the trustee was attempting to pierce the veil of the debtor corporation in order to render the debtor liable for the debts of its former subsidiary, which had also gone through bankruptcy. *Id.* at 480. Some context is needed to make sense of the complex relationships between the relevant parties.

DSI Holding Company, Inc. ("DSI Holding") was a parent company owning various subsidiaries that made up a large healthcare conglomerate. *Id.* at 455. Prior to the filing of any bankruptcy petitions, one of DSI Holding's subsidiaries, DSI Hospitals, Inc., closed one of its

own subsidiaries, the Bucks County Oncoplastic Institute, LLC ("the Bucks County Hospital") because the Bucks County Hospital never made a profit and had incurred millions of dollars of losses. *Id.* at 456. DSI Holding allegedly "guaranteed between $7-9 million of claims owing to creditors of the Bucks County Hospital[.]" *Id.* In order "to avoid DSI Holding['s] liability for the debts of the Bucks County Hospital, [DSI Holding's] management [and] directors caused the Bucks County Hospital to commence a Chapter 7 bankruptcy case" in March 2009. *Id.* However, DSI Holding's status as a co-debtor for the Bucks County Hospital was omitted from the Bucks County Hospital's schedules listing its outstanding debts; the bankruptcy case later closed without DSI Holding's status as co-debtors ever being revealed. *Id.* at 456-57. The directors and officers of DSI Holding allegedly omitted this information "to diminish the likelihood that the Bucks County Hospital's creditors would commence litigation or take other action, such as filing an involuntary bankruptcy proceeding, against DSI Holding, which would have" ruined the directors and officers' scheme to strip out and sell a certain profitable part of the conglomerate's business to benefit themselves. *Id.* at 457-58. Later, in June 2011, DSI Holding, which by then had merged into DSI Renal Holdings, LLC ("DSI Renal") with DSI Renal as the surviving company, *id.* at 455, filed for relief under Chapter 7 of the Bankruptcy Code, *id.* at 453.

The DSI Renal trustee sought to pierce the veil of DSI Renal to hold it "liable for the claims of the non-debtor Bucks County Hospital[,]" *id.* at 478, arguing that DSI Holding had ignored corporate boundaries, controlled Bucks County Hospital personnel, issued purchase orders to hospital vendors, and commingled funds with the hospital.[20] The *DSI Renal* Court,

---

[20]     Unimportant to the decision here but helpful for context: the reason the trustee was seeking to render the debtor "*more* insolvent by taking on the liability of the Bucks County Hospital" was because the trustee argued that he had a "fiduciary relationship with *all* creditors

however, found that under Section 541, "claims for damages caused to individual creditors or stockholders of the debtor" are not property of the bankruptcy estate and so the trustee has no standing to assert them. *Id.* at 479 (internal quotation marks and citations omitted). The court explained that a trustee can bring claims that are derivative of harm to the debtor company but not direct claims based on an injury of the creditor. *Id.* at 480. Thus, the "claim [was] not a derivative claim alleging damages suffered by the [debtor], but a claim seeking a remedy for damages to a particular subset of creditors[ and t]he trustee does not have standing to assert th[at] claim." *Id.*

*DSI Renal* is inapposite to the case here. Contrary to what Harrison argues, (D.I. 22 at 2), *DSI Renal* does not discuss in any detail the relevant law regarding whether a claim is a "general" one for purposes of determining if that claim is property of the bankruptcy estate. Nor does *DSI Renal* discuss *Emoral* or any other similar case. And even viewing *DSI Renal* with the *Emoral* framework in mind, it appears that the veil piercing claim in *DSI Renal* would clearly only have benefitted a certain subset of creditors of DSI Renal (the creditors of Bucks County Hospital, who would have benefitted if the debtor was found to be the hospital's alter ego, causing the estate of the debtor to take on *more debt*). (Tr. at 29, 31) Thus, the claim would not rightly be deemed property of the bankruptcy estate, *inter alia*, because it would not "inure[] to the benefit of *all* creditors." *Emoral*, 740 F.3d at 879 (emphasis added).

For these reasons, it can rightly be said that recovery on Harrison's alter ego cause of

_____

of the estate." *DSI Renal*, 574 B.R. at 478 (emphasis in original). Having "uncovered a potentially fraudulent scheme[,] . . . the [t]rustee [argued that he] should not ignore those creditors [affected by the scheme], but should include those creditors in the" bankruptcy case. *Id.* at 478-79.

action would benefit all creditors of Quivus.

### 4. Conclusion

For the reasons set forth above, the Court finds that the alter ego claim is property of the Quivus bankruptcy estate. Thus, Harrison lacks standing to assert that claim.

### B. Plausibility of Harrison's Alter Ego Claim and Personal Jurisdiction Over Soroof

As was previously noted above, the parties agree that Harrison's standing to bring the alter ego claim is a "threshold issue," (D.I. 21 at 4; Tr. at 5, 36, 54, 59-60), in that Harrison's advancement claim and claim for fees on fees against Soroof are dependent on a finding that Soroof is the alter ego of Quivus. Having found that Harrison does not have standing to bring the alter ego claim, the Court also finds that Harrison's advancement claim and claim for fees on fees must fail.

Thus, the Court need not address the two other grounds of Soroof's Motion—that Harrison's alter ego claim fails as a matter of law under Rule 12(b)(6) and that Soroof is not subject to the personal jurisdiction of this Court under Rule 12(b)(2). (*See* Tr. at 6 ("*If* the Court was to determine that there is no stay in place here, it's our position that the [C]omplaint against Soroof should be dismissed for two reasons.") (emphasis added)) The Court thus finds that Defendant's request for relief on these two additional grounds should be denied as moot.

### C. Dismissal or Stay?

Section 362 of the Bankruptcy Code, titled "Automatic stay[,]" states in part: "(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of . . . (3) any act to obtain possession of

property of the estate or of property from the estate or to exercise control over property of the estate[.]" 11 U.S.C. § 362(a). Section 362(a)(3), the terms of which are further defined by Section 541, applies to actions against third parties as well as actions against the debtor. *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 259-60 (3d Cir. 2006).

Having found that Harrison's alter ego claim is property of the bankruptcy estate under Section 541(a)(1), the automatic stay of Section 362(a)(3) is clearly implicated. The question that remains, however, is whether this means that the instant case should simply be stayed pursuant to Section 362(a)(3), or whether it should instead be dismissed.

In its briefing, Soroof repeatedly argued for dismissal. It asserted that if the Court finds that Harrison lacks standing to bring the alter ego claim, then "in the interests of efficient administration of the already pending [Bankruptcy Action], [all three] claims should be dismissed, and the Trustee should determine whether it wishes to bring such an action within the purview of the Bankruptcy proceedings." (D.I. 6-1 at 20; *see also* D.I. 10 at 3-4; D.I. 21 at 4; D.I. 23 at 2) However, at oral argument, Soroof's position appeared to change, as its counsel asserted that if the alter ego claim is property of the bankruptcy estate, then the appropriate thing for this Court to do would be to stay the instant case. (Tr. at 5-6 ("So as an initial matter[,] the Court will need to decide whether the pierce the corporate veil claim is an asset for the estate and the trustee and *if it is, the case is stayed under the bankruptcy rules.*") (emphasis added); *see also id.* at 8; *id.* at 36 ("[O]ur position is that [the case] should be stayed if it does belong to the trustee."))

The Court finds that Soroof had it right the first time, and will order that this action be dismissed. There is no serious argument that, if this action was pending prior to Quivus'

bankruptcy filing, it would be stayed upon the filing of the bankruptcy petition. *See, e.g.*, *In re S.I. Acquisition, Inc.*, 817 F.2d 1142, 1144-45, 1153-54 (5th Cir. 1987) (concluding that Section 362's automatic stay provision applied to stay further proceedings in a state court action; in the state court action, a creditor was seeking to recover monies owed by the debtor by suing the debtor and by suing third-party non-debtors pursuant to an alter ego claim); *accord ACandS, Inc.*, 435 F.3d at 257, 259 (explaining that an arbitration that instituted prior to the debtor's filing of a bankruptcy petition "should have halted . . . once it became apparent that proceeding further could negatively impact the bankruptcy estate"). Here, however, Harrison commenced this action *after* the Bankruptcy Action had begun. In the Third Circuit, actions taken in violation of an automatic stay are generally void *ab initio* and thus, should be dismissed. *In re Siciliano*, 13 F.3d 748, 750 (3d Cir. 1994) (citing *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991)); *cf. Bartlette v. Kmart Corp.*, 312 F. App'x 441, 441-42 (3d Cir. 2008) (affirming dismissal of a complaint filed against a debtor for violating the automatic stay of 11 U.S.C. § 362(a)(1), in that the complaint was void when filed). However, "actions in violation of the stay, although void (as opposed to voidable), may be revitalized in appropriate circumstances by retroactive annulment of the stay" pursuant to 11 U.S.C. § 362(d). *In re Myers*, 491 F.3d 120, 127 (3d Cir. 2007); *see also In re Siciliano*, 13 F.3d at 750.

In light of the above, then, dismissal appears to be the right remedy. Moreover, although the Third Circuit may not have yet addressed the specific factual scenario at issue here, other courts have found that alter ego claims like Harrison's (those that were void when filed, due to the pendency of the debtor's bankruptcy proceeding) should in fact be dismissed. *See, e.g.*, *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 131, 135 (2d. Cir. 1993) (affirming dismissal of a

42

complaint asserting alter ego claims against a non-debtor on lack of standing grounds, where it

was asserted that the non-debtor was the alter ego of the debtor and where the case was filed after

the initiation of the debtor's bankruptcy petition); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*,

852 F.2d 132, 133, 136 (4th Cir. 1988) (same); *Trs. of the Constr. Indus. & Laborers Health &*

*Welfare Tr. v. Vasquez*, No. 2:09-cv-02231-LRH-GWF, 2011 WL 4549228, at *3 (D. Nev. Sept.

29, 2011) (dismissing an alter ego claim that was property of the bankruptcy estate because it was

filed "long after" the bankruptcy petition and was in violation of the automatic stay); *but see*

*Baillie Lumber Co. v. Thompson*, 413 F.3d 1293, 1295 (11th Cir. 2005) (affirming the stay of a

state court case in which a plaintiff asserted an alter ego claim, where the case was brought after

the debtor had filed a bankruptcy petition ).[21]

 For these reasons, the alter ego claim is dismissed. And because the advancement claim

and the claim for fees on fees are dependent on that alter ego claim, they too are subject to

dismissal.

 The dismissal is without prejudice because there is some chance that Harrison could later

have standing to assert the claim. This might occur, for example, if: (1) the Bankruptcy Court

annuls the stay or (2) the Quivus Bankruptcy Trustee abandons the claim. *See Steyr-Daimler-*

---

 [21] The Bankruptcy Court agreed that, if Harrison's filing of the instant action was in
violation of the automatic stay, it is "void (unless the automatic stay is later annulled)." *In re*
*Quivus Sys., LLC*, Case No. 17-00119, 2018 WL 316976, at *2 (Bank. D.C. Jan. 5, 2018). The
Bankruptcy Court stated that the "District Court is permitted in the civil action [filed] by
Harrison against Soroof [i.e., the instant case] to adjudicate the issue of whether the automatic
stay applies to the alter ego claim" and that the bankruptcy trustee "opposes annulment of the
automatic stay at this juncture to permit Harrison to pursue the District Court civil action." *Id.*
The Bankruptcy Court also stated that it was not ordering the annulment of the automatic stay at
that time and that any "annulment would have to await a motion by Harrison in [that] court[.]"
*Id.* at *2-3.

*Puch of Am. Corp.*, 852 F.2d at 136 (noting that a creditor may only pursue a claim that is property of the bankruptcy estate once there has been a judicial determination that the trustee has abandoned the claim); *In re Flintkote Co.*, 486 B.R. 99, 121 (Bankr. D. Del. 2012) (finding that a trustee would have to abandon an alter ego claim that is property of the bankruptcy estate before individual creditors would have standing to assert it).

## III.    CONCLUSION

For the reasons set forth above, the Court GRANTS-IN-PART the Motion to the extent that it seeks dismissal of this action based on Harrison's lack of standing to assert the alter ego claim. The Court DENIES AS MOOT the remaining grounds asserted in the Motion. A separate order follows.


_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE